**UNION GAS CORP., Appellant,**

v.

**Jimmie B. GISLER, et al., Appellees.**

**No. 13–01–734–CV.**

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Aug. 29, 2003.

Paul S. Francis, Baker & Hostetler, Houston, for Appellant.

Robert C. McKay, Cole, Cole & Easley, P.C., for Appellee.

Before Justice HINOJOSA, RODRIGUEZ and WITTIG.[1]

## OPINION

Opinion by Justice WITTIG.

This is an oil and gas controversy concerning the inception date of royalty pay-

---

**1.** Retired Justice Don Wittig assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (VERNON 1998).

ments. Union Gas Corporation (Union) appeals an adverse partial summary judgment and final judgment in favor of appellees, Jimmy Gisler, Jenell Gisler, Ralph Gisler, and Doris Gisler (the Gislers). Union raises seven issues. It asserts the trial court erred by entering facially contradictory summary judgments in seven related cases. In Union's second issue it argues the court erred in awarding 100% royalties when the Gislers were only entitled to their unit royalty interest. Union next complains that companion plaintiffs should not have been awarded royalties before recordation of the unit designation. Alternatively, Union contends its interpleader entitled it to be released from further liability. Union then argues severally of the severance order between the companion cases, that the judgment was not final, and that the award of attorney's fees was excessive. We have already addressed the jurisdictional issue on the finality of the judgment. This issue was heard by pre-submission motion and denied.[2] We affirm the judgment of the trial court.

### I

Union contracted with the Gislers and various adjoining land owners for multiple oil and gas leases beginning in 1999. Union successfully completed the Watts–Gisler # 1 Well on the Gislers' land in March 2000. The various leases contained pooling provisions allowing for unitized production of gas in ten adjacent tracts. The designation of the pooled unit for the Watts–Gisler Gas Unit was recorded August 7, 2000. No royalties were paid to the Gislers, and they filed suit August 30, 2000. They alleged they were entitled to all royalties from the beginning of production until the August 7th recordation of the unit designation. The Gislers also alleged

bad-faith pooling, damages for drainage, breach of implied covenants, fraud, negligence, conversion, *inter alia*, against Union. Union joined, by a third party action, the adjoining mineral estate owners (other royalty owners) whose rights, it alleged, could be affected by Gislers' bad faith claim. Union argues that a bad faith determination of the pooling unit could eliminate the other royalty owners' royalties. Then, depending on whether all unit royalties were paid from the date of first production or from the date of recordation, the royalty interests of the Gislers and the other royalty owners would also be affected. The other royalty owners counterclaimed against Union seeking royalties from the date of first production based upon the terms contained in the unit designation. The Gislers' oil and gas lease provided that the unit was not effective until the designation was recorded. Thus, the Gislers claimed the full 3/16th royalty for the March through August 7th period. The other royalty owners likewise claimed their proportionate unit share of royalties for the same period and beyond.[3] After claims and cross claims by various parties, Union belatedly interpled the amount of the accrued royalties from the date of initial production until the unit recordation date, in the amount of $1,313,327.38.

The Gislers filed for partial summary judgment for all royalties from the date of first production until the unit recordation date. The other royalty owners followed "suit" with motions for partial summary judgment. The trial court granted all these motions. The court explicitly or implicitly denied Union's motion for interpleader. The trial court subsequently heard evidence on attorney's fees. Most claims were then severed and appeals

---

**2.** Union's Motion to Dismiss was denied August 15, 2002.

**3.** The Gislers' unit royalty rate is 0.02471248.

were taken by Union on the contract issues. The nine appeals were docketed numbers 13–01–734–CV through 13–01–742–CV. The last two numbered appeals have been dismissed.[4]

The Gislers' claims on the lease for past due royalties were severed from their bad faith and other claims, resulting in a final judgment against Union for an amount equal to the interpled funds, plus interest, and attorney's fees in the amount of $250,000.00.

## II

We review the trial court's granting of a motion for summary judgment de novo. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994); *Tex. Commerce Bank–Rio Grande Valley v. Correa,* 28 S.W.3d 723, 726 (Tex.App.-Corpus Christi 2000, pet. denied). The Gislers were required to establish that no genuine issue of material fact existed and that judgment should be granted as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). Where the only question presented to the trial court was a question of law and both sides moved for summary judgment, the appellate court should render the judgment that the trial court should have rendered. *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.,* 46 S.W.3d 880, 883 (Tex.2001); *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988); *Cigna Lloyds Ins. Co. v. Bradleys' Elec., Inc.,* 33 S.W.3d 102, 104 (Tex.App.-Corpus Christi 2000, pet. denied); *The Cadle Co. v. Butler,* 951 S.W.2d 901, 905 (Tex.App.-Corpus Christi 1997, no writ).

## III

For clarity, we address Union's second issue out of order. In issue two, Union argues the trial court erred in granting partial summary judgment because the pooling unit was effective as of the date of first production. In the unit designation, Union stated that the designation would be effective from the date of first production. Union argues the pooling power given the lessee in oil and gas leases is necessarily broad, citing *Elliott v. Davis,* 553 S.W.2d 223, 226 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.). Union argues that pooling powers should be construed broadly and liberally, not narrowly, referencing *Tiller v. Fields,* 301 S.W.2d 185 (Tex.Civ.App.-Texarkana 1957, no writ) and *Texaco, Inc. v. Lettermann,* 343 S.W.2d 726, 732 (Tex. Civ.App.-Amarillo 1961, writ ref'd n.r.e.). Union argues that while a lessee's decision to pool may not be made in bad faith, that issue is usually one of fact, citing several authorities. We do not disagree with any of these propositions, but fail to see any reference to precedent that guides the trial court or us in determining the material contract issues in this case.

The Gislers rejoin that there are no issues of fact; that both the trial court and we are faced only with a question of law-proper for summary judgment. We agree. Union's obligations to pay royalties are governed by the terms and conditions of the oil and gas lease contract. That, of course, is the question. Is the payment of royalties governed solely by the oil and gas contract, or is the payment governed by the unitization declaration? Citing *Jones v. Killingsworth,* 403 S.W.2d 325, 328 (Tex.1965), the Gislers argue that the intent of the parties must be determined as a matter of law from the language of the written contract. They contend the clear and unambiguous language of the lease between the Gislers and Union provides, with regard to pre-pooling royalty:

4. This opinion is thus the first of seven related cases.

Lessee shall file for record in the appropriate records of the county in which the leased premises are situated an instrument describing and designating the pooled acreage as a pooled unit; *and upon such recordation the unit shall be effective as to all parties hereto,* their heirs, successors, and assigns, irrespective of whether or not the unit is likewise effective as to all other owners of surface, mineral, royalty or other rights in land included in such unit.

(Emphasis added). The Gislers contend this contract cannot be unilaterally altered by Union. They argue from *Sauder v. Frye,* 613 S.W.2d 63, 64 (Tex.Civ.App.-Fort Worth 1981, no writ). The *Sauder* opinion interprets the contract language requiring that when the lessee creates pooled units he "shall execute in writing and record in the county." *Id.* The court held that Sauder failed to comply with a contractual condition precedent to record within the primary term of the lease; no extension of the lease thus resulted, even though the pooling terms were executed within the primary term of the lease. *Id.* That court also distinguished *Tiller,* which is relied upon by Union. *Tiller,* 301 S.W.2d at 191. In *Tiller,* the unit designation was both executed and recorded in the primary term. *Id.; see Sauder,* 613 S.W.2d at 64.

Union and the Gislers both argue from *Circle Dot Ranch v. Sidwell Oil & Gas,* 891 S.W.2d 342 (Tex.App.-Amarillo, 1995, writ denied). According to Union, a presumption of good faith allows its decision to pool to be effective at the date of first production. *See id.* at 347. The Gislers point out that in *Sidwell,* prior to trial, Sidwell conceded Circle Dot's entitlement to the full 3/16 royalty up to the time the unit designation was filed. *Id.* at n3. We agree with the Gislers, but also note that *Sidwell* was a summary judgment case, primarily dealing with whether a fact issue was raised on good faith. *Id.* at 343.

The Gislers also cite a secondary source, *Cummings: "Pooling Issues–Avoiding Pitfalls,"* 1995 State Bar of Texas Advanced Oil, Gas & Mineral Law Course. There, we are informed that most pooling clauses now affirmatively require the unitization declaration to be filed of record. *Id.* If the pooling clause requires recordation, it is not effective until actually filed in the appropriate county; execution and acknowledgment is insufficient. *Id.*

The Gislers also cite *Yelderman v. McCarthy,* 474 S.W.2d 781 (Tex.Civ.App.-Houston [1st Dist.] 1971, writ ref'd n.r.e.). It is true *Yelderman* holds that the gas unit must be considered as effective from the date of its recordation. *See id.* at 784. However, *Yelderman* primarily dealt with agency questions and accord and satisfaction. *Id.*

The Gislers' final argument germane to this contract issue comes from *Browning Oil Co., Inc. v. Luecke,* 38 S.W.3d 625 (Tex.App.-Austin, 2000, pet.denied). *Luecke* observes:

1. Lessee's authority to pool is derived solely form the terms of the lease; a lessee is without such power absent express authority.
2. Parties to an oil and gas lease must strictly comply with its terms.
3. An oil and gas lease is a contract to be interpreted as such.
4. In construing an unambiguous oil and gas lease the Court must determine the intention of the parties as expressed in the lease.
5. The writing alone expresses the intent of the parties. Thus the Court will enforce an unambiguous lease as written.

*Id.* at 640. We agree.

■ Other than urging its broad authority for pooling, which is not disputed, Un-

ion gives us little cause to stray from the law in *Luecke*. The Gislers' oil and gas lease provides for their 3/16 royalty and, under their lease, the pooling designation was effective upon recordation. Insofar as the Gislers' lease is concerned, we should enforce the plain terms of the agreement. *See Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 72 (Tex. 1964). We will now address the interplay of this issue with Union's first issue.

The Hobson's choice presented Union is addressed in its first issue. There, Union claims the trial court erred by entering facially contradictory summary judgments in the six companion cases. The challenge presented is the apparently conflicting ruling by the trial court in granting not only Gislers' partial summary judgment but also six other motions by the other royalty owners. Union argues, and we agree, that the pooling clauses of the other royalty owners' leases are either identical, or functionally identical. Union charges the trial court failed to recognize this identity of language. We quoted above the Gislers' pooling clause and observe that other royalty owners, Dornberg/Dentler, Arnold, and Mission Valley Cemetery Society, share the same lease language. The pooling clause of the remaining three royalty owners states, in part, that: "Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded." The greater controversy however, derives from Union's own unit designation filed of record August 7, 2000. There Union, not the trial court, stated in the last paragraph: "In Witness Whereof, this instrument is executed this 29th day of July 2000 but *effective as of the date of first production* from the Union gas Operating

company, Watts–Gisler # 1 well." (Emphasis added.) This causes an apparent conflict because, according to Union's contract with the Gislers, pooling was not effective until recordation. Yet in the recordation, Union states that pooling was retroactively effective to first production, which occurred in March, 2000.

Union accuses the trial court of abusing its discretion in reaching its decision regarding this issue. However, abuse of discretion is not the standard of review for a summary judgment. The propriety of a summary judgment is a question of law and we review the trial court's decision de novo. *Natividad*, 875 S.W.2d at 699.

 Absent express authority, a lessee has no power to pool the lessor's interests with the interests of others.[5] *Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex.1999); *Luecke* 38 S.W.3d at 640. "For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease." *Killingsworth*, 403 S.W.2d at 327–28. "The lessors' land may be pooled only to the extent stipulated in the lease." *Id.* A contract is not ambiguous if it can be given a certain or definite legal meaning or interpretation. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996). Because Union did not pool in accordance with its lease with the Gislers, insofar as the effective inception date is concerned, it cannot escape its prior and material contractual obligations to the Gislers. We hold Union may not modify extant contract rights by a subsequent, unilateral, unit designation. Union's first and second issues are overruled.

**5.** The Texas Supreme Court notes this authority is usually found in the pooling clause.

*Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex.1999).

Union's third issue concerns the summary judgments granted to the other royalty owners—not the subject of this appeal. Notably, Union cites *Tichacek* for the proposition that they are entitled to royalties only if and when their land is pooled with Gislers. *See Tichacek,* 997 S.W.2d at 170. There is no need to address this issue further in this case.[6]

■ Next, Union alternatively contends its interpleader action entitled it to be released from further liability. Union's interpleader was not filed until the fourteenth month after production commenced in March 2000. In other words, Union withheld royalty payments from March 2000 until its attempted interpleader in May of 2001. The measure apparently was undertaken as a part of its response to the Gislers' motion for partial summary judgment. Union argues the interpleader entitles it to be discharged from further liability. It cites *Olmos v. Pecan Grove Mun. Util. Dist.,* 857 S.W.2d 734, 741 (Tex. App.-Houston [14th Dist.] 1993, no writ). *Olmos* describes the elements necessary for a valid interpleader action under rule 43 of the rules of civil procedure. *See* Tex.R. Civ. P. 43. The rule authorizes a defendant who receives multiple claims to property in its possession to join all claimants in the lawsuit and deposit the disputed property into the registry of the court. *Olmos,* 857 S.W.2d at 741. An interpleading party is entitled to interpleader relief if three elements are met: (1) he is either subject to, or has reasonable grounds to anticipate, rival claims to the same fund or property; (2) he has not unreasonably delayed filing his action for interpleader; and (3) he has unconditionally tendered the fund or property into the registry of the

court. *Id.* We acknowledge this authority as a correct statement of the law.

Union also argues that it should be discharged of liability to competing claimants by the interpleader, citing *Citizens National Bank of Emporia, Kansas v. Socony Mobil Oil Co., Inc.* 372 S.W.2d 718, 722 (Tex.Civ.App.-Amarillo 1963, writ ref'd n.r.e.). *Socony* held the interpleader was proper for a tender of the shut-in payment and sufficient to keep the lease in force; the company's completion of a third well to keep the lease in force was also sufficient. *Id.*

The Gislers counter that the attempted interpleader is immaterial to the contract issue of whether they are entitled to the 3/16th royalty under the lease, prior to the effective pooling (August 7, 2000). The Gislers agree to the three criteria of required proof argued by Union, as cited above in *Olmos*. *See Olmos,* 857 S.W.2d at 741; *Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372, 384 (Tex.App.-San Antonio 1992, writ denied). They also correctly contend that failure to meet any of these elements defeats an interpleader action. *Daniels,* 831 S.W.2d at 385. The Gislers argue Union is not an innocent stakeholder.

■ If multiple claimants have independent claims of liability, the stakeholder is not subject to multiple liability for the same property or fund. *Farmers State Bank v. Nat'l Fire Ins. Co.,* 169 S.W.2d 545, 549, (Tex.Civ.App.-Waco 1943, no writ). We also agree with this in principle, because each of the lease agreements creates separate and distinct obligations of Union. While we agree in principle, we do not fully accede to the Gislers' extension of

---

**6.** Union filed the same brief in all seven related appeals. Some of its arguments against the other royalty owners aid the Gislers here. We view Union's issue three to be germane to

the appeals of the other royalty owners, where we will fully address that issue. *See* Tex.R.App. P. 47.1.

this argument that the rival claims here are not necessarily related to the same fund or property. *See Olmos,* 857 S.W.2d at 741. It is possible that the interpled money constituted one fund for the payment of royalties from onset of production until August 7, 2000. This would be true if Union's obligations to the Gislers and other royalty owners were mutually exclusive, and the payment source was a single, finite fund. However, the Gislers' contention would be correct if Union's obligations under the various contracts clearly set up different claims that did not require payment of one claimant to the exclusion of other claimants. *See id.*

In a variation of their one fund argument, the Gislers contend that interpleader is an equitable remedy. Accordingly, equity will not allow Union to escape its own separate contractual obligations to multiple parties. The Gislers cite *Southern Insurance Co. v. Federal Service Finance Corp.,* 370 S.W.2d 24, 27 (Tex.Civ. App.-Austin 1963, writ dism'd). That court held the two claims, one for the price of the car substituted, and another as beneficiary under the contract of insurance, were two separate and distinct contracts, and the cases could have been severed before trial. *Id.* "The rights of Simmons under its contract with Southern had no bearing on Federal's rights under the insurance contract...." *Id.* We agree with the analogy.

 The purpose of interpleader is to allow an innocent stakeholder facing rival claims to let the courts decide who is entitled to the fund and thus avoid the peril of acting as judge and jury itself. *Olmos,* 857 S.W.2d at 741; *Gabler v. Minn. Mut. Life Ins. Co.,* 498 S.W.2d 413, 418 (Tex.Civ.App.-Texarkana 1973, no writ). However, we do not believe Union is in the position of an innocent stakeholder for several reasons. First, it failed to

meet its obligations under its contract with the Gislers. *See S. Ins. Co.,* 370 S.W.2d at 27. It was Union itself that created its own predicament by contracting with the Gislers in 1999 that unitization pooling was not effective until the date of recordation. Thereafter, in its unilateral unitization designation, it inserted a conflicting and contradictory clause facially abrogating their prior contract obligations with the Gislers. In order to claim equitable relief, a party must do equity. *Bush v. Gaffney,* 84 S.W.2d 759, 764 (Tex.Civ.App.-San Antonio 1935, no writ).

> For a complainant to be entitled to relief in equity, it is necessary that he bring himself within the full meaning of the maxims that he who seeks equity must do equity, and that he who comes into equity must come with cleans hands. These maxims comprehend not only the previous conduct of the complainant toward the defendant, but also the attitude of the complainant toward the defendant throughout the litigation. The complainant must in good conscience offer to do equity and to have the court accord to the defendant all of his rights.

*Id.* Similarly, when an interpleading party is responsible for the conflicting claims to funds, that party is not entitled to attorney's fees. *Tex. State Bank & Trust Co. v. Patee,* 111 S.W.2d 1157, 1160 (Tex.Civ. App.-San Antonio, 1937, no writ). We do not believe the trial court, in the exercise of its equity jurisdiction, abused its discretion by denying the interpleader.

Further, Union produced and presumably sold many millions of dollars worth of gas production from Watts–Gisler #1 from March 2000 until it filed its interpleader in May 1, 2001. During this nearly fourteen month period, Union paid no royalties to anyone. And its interpleader was only brought after suit was on file for nine months, summary judgment was

sought by the Gislers, and the summary judgment hearing was set. Contemporaneously with its interpleader, Union also sought a continuance from the May 8th summary judgment hearing. Because Union waited over a year to tender past due royalties into the court's registry, we also believe the trial court could have properly found that Union unreasonably delayed filing its action for interpleader. *See Sav. & Profit Sharing Fund of Sears Employees v. Stubbs,* 734 S.W.2d 76, 79 (Tex.App.-Austin 1987, no writ) (unreasonable to wait almost three years before initiating the action in interpleader). Union's fourth issue is overruled.

Union next complains of the severance granted by the trial court. Union states the issue as follows: "The trial court erred in severing the Gislers and the counter plaintiffs' claims from the bad faith pooling claims of the Gisler, Watts and Greeson plaintiffs because determination of the bad faith pooling claims could result in either the invalidation of the Unit or a reformation of the Unit which would affect the parties' rights to royalties before and after August 7." Union argues that implicit in the dispute of the severed claims is the validity and effect of the unit designation. A determination of the bad faith pooling claims could result in reformation or invalidation of the pooling unit, thus affecting royalty rights before and after August 7, 2000. Union concludes its argument that the severed claims are intertwined with "the remaining trial court action and involves the same facts and issues."

As Union correctly indicates, the bad faith pooling claims, among others, of the Gislers, Watts and Williams were severed by the trial court into separate lawsuits. In the severance, the contract claims of the Gislers and other royalty owners were finalized and made the subject of several appeals. Because of the severance, the judgment in this case deals only with the Gislers' oil and gas contract claim from March 2000, until August 7, 2000. Union argues that if the unit is retroactively valid to the date of first production, the Gislers share royalties on a pro rata acreage basis. However, as to the Gislers, we have already held Union may not modify their extant contract rights by a subsequent, unilateral, unit designation pertaining to the initial disputed time period.

Union primarily relies upon a decision from this Court. In *Nicor Exploration* we specifically discussed severance in an oil and gas case. *Nicor Exploration Co. v. Florida Gas Transmission Co.,* 911 S.W.2d 479, 482–83 (Tex.App.-Corpus Christi 1995, writ denied). In *Nicor Exploration,* we held that severance of a claim is proper if: (1) the controversy involves more than one cause of action; (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted; and (3) the severed claim is not so interwoven with the remaining action that it involves the same facts and issues. *Id.* We also noted that the controlling purpose of a severance is to do justice, avoid prejudice, and for convenience of the parties. *Id.* at 482. In *Nicor Exploration,* however, not only was the same cause of action alleged against Florida Gas, but the action arose from a single contract for the purchase of natural gas, from the same well, by the same buyer. *Id.* Although the claim was identical, involving the same facts and issues, the trial court effectively severed a party, instead of a cause of action. *Id.*

Both parties agree that severance is discretionary with the trial court. We are not to disturb a trial court's finding with respect to severance absent an abuse of discretion. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 658 (Tex.1990). If an abuse of discretion

is found, we will reverse and remand the case to the trial court. *Nicor Exploration,* 911 S.W.2d at 482–83. The Gislers disagree with both the factual assumptions and the legal arguments of Union. The Gislers point out that in addition to the other royalty owners whose claims for unit royalties were severed, there is both acreage that was not pooled belonging to the other royalty owners, plus approximately 120 acres in the Watts lease, and 100 acres in the Williams lease, which partially comprise the pooled unit.[7] The latter two leases were not before the trial court or us, according to the Gislers. Therefore, the royalties claimed are not, and under the circumstances, could not be, identical.

■ Clearly the actions asserted by the multiple parties involve a myriad of claims from breach of contract to fraud, bad faith pooling, negligence, *et cetera. Cf. id.* The severed contract claim of the Gislers could have been independently asserted. *Id.* Indeed, the Gislers originally asserted their contract and other claims independently against Union. After the Gislers asserted their independent claims, Union brought in the third parties—the other royalty owners, who in turn cross filed against Union. The other royalty owners make no claims for bad faith or other torts. Their claims sound only in contract, individually based, separate and distinct from each other, and from the Gislers' claims. The severed contract claim of the Gislers is not so interwoven with the remaining action that it involves the same facts and issues. First, the bad faith, negligence, and other claims of the Gislers principally involve tort, non-contract, claims. The factual support for such claims must, per force, range well beyond the more narrow confines of the four corners of the Gislers' contract with Union.

Rather, the concern is whether the royalty claims of the other royalty owners is so interwoven with the Gislers' royalty claim that it involves the same facts and issues. *See id.* We believe the multiple claims by the several other royalty owners are separable and distinct from the Gislers' royalty claim.

Union had multiple oil and gas leases, independently negotiated and executed between itself, the Gislers, the other royalty owners, plus the Watts, and the Williams. This sharply contrasts with the situation in *Nicor Exploration* where there was but one contract, one set of facts, and one set of issues. *Id.* Above, we held that Union breached its contract with the Gislers. Separate and discreet issues were decided by the trial court regarding whether Union breached its other contracts with the other royalty owners.[8] While it is true that the unit designation is a single instrument, it must be read in the context of its interplay with each different lease. The Gislers' lease provides that pooling is effective upon recordation "as to all parties hereto, their heirs, successors, and assignees, irrespective of whether or not the unit is likewise effective as to all other owners of surface, mineral, royalty. . . ." Thus, an express covenant of Union's own lease with the Gislers states contractual obligations independent of the other royalty owners.

Union also argues that the severed bad faith claims could result in the invalidation or reformation of the pooled unit. As to the Gislers, this is simply not the case, assuming we correctly decided that the Gislers' lease entitled them to a 3/16 royalty from March until August 7, 2000. Without citing authority, Union also argues that a successful invalidation of the unit by Gislers or others, would "logically" negate

---

7. Watts and Greeson also brought bad faith pooling claims.

8. Division orders and other documentation further potentially differentiate the claims.

the other royalty owners' rights to royalties.

It is now settled law involving oil and gas leases that the rights, duties, and obligations of both the lessor and the lessee are determined by the lease. *Williamson v. Mobil Producing Tex. & N.M. Inc.*, 737 S.W.2d 917, 921 (Tex.App.-Beaumont 1987, writ denied) (citing *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex. 1981)). Just as in *Williamson*, Union agreed and contracted to pool various properties. *Id.* "[T]hereafter, it would not reduce nor modify nor dissolve the unit at any time after discovery and prior to the cessation of production of minerals therefrom." *Id.*[9] In the face of a bad faith pooling claim, a lessee may not withhold royalty payments in breach of a written contract. *Id.* The *Williamson* court also duly noted that the bad faith claim involved other parties in the pooling unit, not the Williamsons. *Id.* Here the bad faith claims do involve the Gislers, but not necessarily the other royalty owners. The same logic would apply that the rights of the other royalty owners would be governed by their lease contracts, not by the Gislers' contracts, nor should they arguably be affected by any alleged bad faith by Union.

The Gislers finally argue that non-drillsite owners are not necessary parties to a bad faith pooling claim, citing *Sabre Oil & Gas Corp. v. Gibson*, 72 S.W.3d 812, 816 (Tex.App.-Eastland 2002, pet. denied). The Gibsons brought suit against Sabre seeking a determination that their oil and gas lease had terminated and that the Gibson # 1 Unit was void. *Id.* The trial court provided the requested relief without joining the other royalty owners. *Id.* "Although they had an interest in that their share of the production from the pooled unit would be affected, presence of the other royalty owners was not necessary to determine whether Sabre pooled in bad faith and breached the terms of the lease." *Id.*

The severance of claims under the Texas Rules of Civil Procedure rests within the sound discretion of the trial court. *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex.1996). We hold the severed actions are not so interwoven with the other claims that they involve the same facts and issues. Accordingly, we do not find that the trial court abused its discretion. *See F.F.P. Operating Partners, L.P. v. Duenez*, 69 S.W.3d 800, 807–08 (Tex. App.-Corpus Christi 2002, pet. granted) (holding trial court properly severed contribution claims because indemnity action did not accrue until suit concluded and judgment taken).

 In its last issue, Union complains of excessive attorney's fees. On a $1,313,327.38 past-due damage award, Union states $250,000 is excessive "as a matter of law." The Gislers' counsel testified he performed 420 hours of work. On a strictly hourly basis, a reasonable hourly fee was $102,418.75. On a contingent fee basis pursuant to the Gislers' contract with their attorneys, a reasonable fee would have been $563,259.15. Various attorneys testified to hourly rates of $250 per hour, $300 per hour and Union's own attorney testified that attorneys from his firm charge $400 per hour for complex litigation. Although the Gislers argued for a contingent fee of 39.5%, they were awarded less than half of that amount. While Union argues the effective rate might have been $1,341 per hour, the actual amount awarded by the trial court came to $595 per hour.

9. The lease language regarding the modification and dissolution of the unit in *Williamson*, is virtually the same as that of the Gislers and the other royalty owners. *See id.*

 We review an award of attorney's fees utilizing an abuse of discretion standard. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985). In a nonjury trial, where findings of fact and conclusions of law are neither filed nor timely requested, it is implied that the trial court made all necessary findings to support its judgment. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 83 (Tex.1992). We view the evidence in the light most favorable to the trial court's ruling and indulge every presumption in its favor. *Phillips & Akers, P.C. v. Cornwell,* 927 S.W.2d 276, 279 (Tex.App.-Houston [1st Dist.] 1996, no writ). The Texas Supreme Court informs us that the factors that we are to consider when determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997).

Generally, a lawyer's fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable. TEX. DISCIPLINARY R. PROF'L CONDUCT 104, reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, § 9); *see Gen. Motors Corp. v. Bloyed,* 916 S.W.2d 949, 960 (Tex.1996) (discussing lodestar method to calculate lawyer's fees in class actions, calculated by multiplying the number of hours expended by appropriate hourly rate determined by factors, such as the benefits for the class, complexity, the expertise of counsel, the preclusion of other legal work, and the hourly rate customarily charged in the region for similar legal work). Union also cites *PPG Indus., Inc. v. JMB/Houston Ctrs. Ltd. P'ship,* 41 S.W.3d 270, 285 (Tex.App.-Houston [14th Dist.] 2001, pet. granted), for the proposition that a fee, based even in part upon the outcome of the case, is a contingent fee that may not be transferred to the opposing party. This statement is dicta [10] because the plurality opinion went on to approve a $300,000 adjustment as not being a "bonus" conditioned upon the outcome of the case, "but a reasonable and necessary conformation of the fee agreement which met the proper legal standards for attorney fees." *Id.* In *Andersen,* the Texas Supreme Court observed the DTPA does not authorize the shifting of the plaintiff's entire contingent fee to the defendant without consideration of the factors required by the rules of professional conduct. *Arthur Andersen & Co.,* 945 S.W.2d at 818. The court went on to observe that a party's contingent fee agreement should be considered by the

---

**10.** Not only is this statement dicta, but no authority is cited for its bold pronouncement. The Code of Professional Conduct (and *Andersen)* specifically contradict our sister court. Rule 1.04(4) lists "the amount involved and the results obtained" as a factor that may be considered. Texas Disciplinary Rules of Professional Conduct (1990). Similarly, Rule 1.04(8) lists whether fee is fixed or contingent or results obtained as another factor that may be considered. *Id.* We can only assume the court meant that under the DTPA an entire contingent fee contract cannot be shifted to the defendant without considering the other factors of reasonableness. *See Andersen,* 945 S.W.2d at 818.

factfinder, *see id.* (citing TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b)(8)), and is therefore admissible in evidence, but that the agreement, standing alone, cannot support an award of attorney's fees under Texas Business and Commerce Code section 17.50(d). *Id.*

There are no findings of fact or conclusions of law. Therefore, it is implied that the trial court made all necessary findings to support its judgment. *Heine,* 835 S.W.2d at 83. Union offers no basis to dissuade us from holding that the trial court properly followed the law and the standards set out in Texas Disciplinary Rules of Professional Conduct. Because the trial court's award was based on conflicting evidence, we find the trial court did not act arbitrarily or unreasonably. *See Schlager v. Clements,* 939 S.W.2d 183, 191 (Tex.App.-Houston [14th Dist.] 1996, writ denied). Union's final issue is overruled.

The judgment of the trial court is affirmed.