

# NUMBER 13-05-00621-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI—EDINBURG

_____

DAVID OHRT, SANDRA HESTER,
AND JUDY SINAST,                                              Appellants,

v.

UNION GAS CORPORATION,
UNION GAS FUNDING I, LP,
ENDEAVOR NATURAL GAS, LLC,
RANDALL K. LOWRY JR., RUSSELL CHABAUD,
JOHN MOFFITT, N. L. VANNAMAN,
STEPHENS GROUP, INC.
D/B/A STEPHENS PRODUCTION COMPANY,
DEAN CHILCOAT, JEANETTE CHILCOAT,
VIOLA ELIOT, AND WDC VENTURES, LTD.              Appellees.

---

### On appeal from the 24th District Court
### Victoria County, Texas

---

# OPINION

### Before Justices Garza, Vela and Perkes
### Opinion by Justice Perkes

This is an oil and gas case.[1]  Appellants, David Ohrt, Sandra Hester and Judy Sinast (collectively "appellants" or "Ohrts"), the lessors of an oil and gas lease, brought suit against appellees, Union Gas Corporation (the lessee) ("Union Gas"), Union Gas Funding I, LP, Endeavor Natural Gas, LLC, Randall K. Lowry Jr., Russell Chabaud, John Moffitt, N. L. Vannaman, Stephens Group, Inc. d/b/a Stephens Production Company, and Calpine Natural Gas Company (defendants below), alleging breach of lease and bad faith pooling.  Appellants sought to have the pooled unit cancelled, to recover pre-pooling unpaid royalties from the date of first production of the pooled unit to the day of filing of the unit designation, and to recover 100% of the royalties attributable to the well's production.  Union Gas subsequently filed a third party action impleading the other lessors in the pooled unit—the McAdamses[2], the Chilcoats,[3] and the Heinolds.[4]  After the jury returned a verdict against appellants, the trial court rendered judgment approving of Union Gas's exercise of its pooling powers and declaring the percentage interests of the respective lessors in the pooled unit.[5]  We affirm.

---

[1]  This appeal, which was originally filed in late 2005, has been plagued by numerous delays occasioned by, inter alia, motions for extensions of time to file the clerk's record, the reporter's record, and the numerous briefs filed by the various parties.  We further note that the appeal was abated for three and a half years due to the bankruptcy of Calpine Corporation.

[2]  Avery Louis McAdams, Neva Billo McAdams, Robert Billo McAdams, Mattie Nell McAdams Diebel, Lea Emilia McAdams Fossati, Marlon Bryan McAdams, and Jamie Ray McAdams.

[3] Dean Chilcoat, Jeanette Chilcoat, Viola Eliot, and WDC Ventures, Ltd.

[4] Luella Maurer, Gayle Heinold, and Kenneth Heinold.

[5]  The McAdamses also perfected appeals from the judgment of this cause.  Their appeals were severed from this cause and filed under cause numbers 13-05-621-CV and 13-06-009-CV.  These appeals were dismissed pursuant to their request on January 12, 2006.  *See McAdams v. Union Gas Corp.*, No. 13-05-00621-CV, 2007 Tex. App. LEXIS 243 (Tex. App.—Corpus Christi 2006, no pet.) (mem. op.) and *McAdams v. Union Gas Corp.*, No. 13-06-00009-CV, 2007 Tex. App. LEXIS 243 (Tex. App.—

## I. BACKGROUND

Between 1999 and 2000, Union Gas entered into separate oil and gas leases in Victoria County with Burnette Ohrt,[6] David Ohrt, the McAdams, the Heinolds, the Chilcoats, and Ronald Albrecht.[7] Each of these leases gave Union Gas "the right, at its option, to pool or unitize any land covered by [the] lease" with "any other land, lease, or leases, as to any or all minerals or horizons." Appellants' leases also provided that "[l]essee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which the lease is recorded." After obtaining the leases, Union Gas contracted with Union Gas Operating Company ("UGOC"), its wholly owned subsidiary, to act as operator.[8]

In July 2000, UGOC drilled and completed the Ohrt-Albrecht No. 1 Well on land owned by Ronald Albrecht. At or around that time, Union Gas and appellants negotiated an amendment to their leases regarding contingencies in the event that Union Gas exercised its option to pool acreage for gas production. In August to September 2000, UGOC drilled and completed the Ohrt-Heinold No. 1 Well on land appellants owned. By the end of September 2000, production of gas was established.

---

Corpus Christi 2006, no pet.) (mem. op.). Calpine Natural Gas Corporation also perfected an appeal from the judgment of this cause. Its appeal was severed from this cause into cause number 13-09-00414-CV, which was later dismissed on October 8, 2009 pursuant to Calpine's request. *See Ohrt v. Calpine Corp.*, No. 13-09-00414-CV, 2009 Tex. App. LEXIS 7848 (Tex. App.—Corpus Christi 2009, no pet.).

[6] Burnette Ohrt conveyed all of her lease interest to her children, appellants herein.

[7] Ronald Albrecht is not a party to this lawsuit, and the Ohrt-Albrecht Gas Unit is not at issue in this lawsuit.

[8] Union Gas transferred some of its interest to other working interest owners: Union Gas Funding I, LP, Endeavor Natural Gas, LLC, Randall K. Lowry Jr., Russell Chabaud, John Moffitt, N. L. Vannaman, Stephens Group, Inc. d/b/a Stephens Production Company, and Calpine Natural Gas Company. No allegations of liability were made specifically against the working interest owners; rather, the Ohrts generally alleged their claims against all "defendants" without elaboration.

Union Gas exercised its option to pool and formed the Ohrt-Albrecht Gas Unit and the Ohrt-Heinold Gas Unit. On October 10, 2000, UGOC filed a Designation of Pooled Unit in the public records in Victoria County creating the Ohrt-Albrecht Gas Unit, comprised of 697.4935 acres, including 82 acres of appellants' land. The Designation stated that it was effective as of the date of first production of the Ohrt-Albrecht Well in July 2000.

On January 15, 2001, UGOC filed a Designation of Pooled Unit creating the Ohrt–Heinold Gas Unit, comprised of 690.73 acres, which stated that its effective date was the date of first production from the Ohrt-Heinold No. 1 Well. The Ohrt–Heinold Gas Unit pooled together part of appellants' property, the entirety of the Chilcoats' property, the entirety of the Heinolds' property, and part of the McAdamses' property. The litigation at issue arises from the formation of this unit. The oil and gas leases and resulting pooling is shown, as follows:

| Lessor | Leased Acreage | Acres Included Ohrt-Heinold Gas Unit | Acres Included Ohrt-Albrecht Gas Unit |
|---|---|---|---|
| Burnette Ohrt | 209.21 | 149.21 | 60 |
| David Ohrt | 161.39 | 138.5 | 22 |
| Chilcoat | 160.19 | 160.19 | 0 |
| Heinold | 121.47 | 121.47 | 0 |
| McAdams | 375.10 | 120 | 0 |
| Ronald Albrecht | 32.98 | 0 | 32.98 |
| Misc. Others | 582.51 | 0 | 582.51 |
| TOTAL | | 690.73 | 697.49 |

Around January 19, 2001, UGOC sent division orders to appellants containing the identity and size of the unit and stating its effective date as the date of first production. Appellants executed the division orders, wherein they certified their ownership of their decimal unit interest in production and agreed to notify UGOC in

writing of any change in their decimal interest in the Unit.[9]  In March 2001, Union Gas began paying royalties on production from the Unit to appellants in accordance with the decimal royalty interests shown in the division orders.[10]  Appellants subsequently received and cashed monthly royalty checks, accompanied by statements of production and calculations.

On October 30, 2001, appellants' counsel sent a demand letter to Union Gas demanding 100% royalties from the date of first production of the Ohrt-Heinold Well through January 14, 2001 (the day before Union Gas filed a Designation of Pooled Unit creating the Ohrt-Heinhold Unit).  On November 12, 2001, Union Gas suspended royalty payments to all unit royalty owners, thereafter holding all royalties in a suspense account pending the resolution of the Ohrts' claim.  This lawsuit ensued.

This matter was tried to a jury on appellants' claims for bad-faith pooling and breach of lease.  The jury rendered a unanimous verdict in favor of appellees.  The jury found that appellees did not breach their duty to pool the Burnette Ohrt lease into the Ohrt-Heinold Gas Unit or their duty to pool the David Ohrt lease into the Ohrt-Heinold Unit in good faith.  The jury further found that appellants' conduct constituted "ratification, waiver, and/or estoppel," which excused appellees from paying a full 3/16th royalty on production prior to the date of the filing of the Unit Designation on January 15, 2001.  Finally, the jury found that appellants' conduct constituted "ratification, waiver, and/or estoppel," which excused "any failure to comply with the lease term that only 320

---

[9] The Ohrts previously went through the same process from October 2000 to January 2001 as to the Ohrt–Albrecht Gas Unit, where the subsequently-filed designation stated the effective date of the unit was from the date of first production.

[10] The first payment made to the Ohrts included their unit royalty shares from the date of first production and included statements reporting the amount of production and calculations of unit royalties during that period.

acres +10% tolerance could be pooled as to depths 9000 feet and shallower for the production of gas." The trial court entered judgment in accordance with the verdict.

Appellants present four issues, supported by numerous sub-issues, wherein they contend: (1) they are conclusively entitled to recover unpaid pre-pooling royalty in the amount of $838,399.26; (2) because the designation of the pooled unit failed to comply with the depth limitation in the Ohrt leases, the appellees' attempt to pool the lease with others is invalid, as a result of which appellants are entitled to 3/16th of production from the Ohrt-Heinold No. 1 Well; (3) the cause should be remanded for a new trial on appellants' claim for attorney's fees and, alternatively, a new trial on their breach of lease claims if their "no evidence" contentions in issues one and two are not sustained; and (4) the take-nothing judgment on appellants' bad faith pooling claim should be reversed and remanded for a new trial.

## II. STANDARD OF REVIEW

"An oil and gas lease is a contract, and its terms are interpreted as such." *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 210–11 (Tex. 2011) (quoting *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005)); *accord Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). When we construe an unambiguous oil and gas lease, we seek to enforce the parties' intention as expressed in the lease. *Exxon Corp.*, 348 S.W.3d at 211; *Tittizer*, 171 S.W.3d at 860; *PG&E Gas Transmission v. City of Edinburg*, 59 S.W.3d 225, 227 (Tex. App.—Corpus Christi 2001), *aff'd in part & rev'd in part on other grounds*, *S. Union Co. v. City of Edinburg*, 129 S.W.3d 74 (Tex. 2003). We enforce an unambiguous document as it is written. *See Tittizer*, 171 S.W.3d at 860; *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981). We examine all parts of the contract and the circumstances surrounding its formulation. *See Columbia*

6

*Gas Transmission Corp. v. New Ulm Gas, Ltd*., 940 S.W.2d 587, 591 (Tex. 1996); *PG&E Gas Transmission*, 59 S.W.3d at 227–28. Instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the instruments were executed at different times and do not expressly refer to each other, and a court may determine as a matter of law that multiple documents comprise a single written contract and construe them accordingly. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex. 2000); *In re BP Am. Prod. Co.*, 97 S.W.3d 366, 369 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Whether a party has breached a contract is a question of law for the court, not a question of fact for the jury. *See Garza v. Southland Corp.,* 836 S.W.2d 214, 219 (Tex. App.—Houston [14th Dist.] 1992, no writ). The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury. *See ITT Commercial Fin. Corp. v. Riehn*, 796 S.W.2d 248, 253 n.3 (Tex. App.—Dallas 1990, no writ).

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). The test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. In reviewing factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and we may "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

7

### III. POOLING

We begin with an overview of the law applicable to the events underlying this appeal. Certain covenants are implied in most oil and gas leases. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999). The standard of care in measuring a lessee's performance of these implied covenants is that of a reasonably prudent operator carrying out the purposes of the lease under the same or similar circumstances. *Id.*; *see Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567–68 (Tex. 1981). One of these covenants imposes a duty to protect the leasehold from local and field-wide drainage. *See HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 889 (Tex. 1998). A lessor may employ various methods to satisfy its duty to protect the leasehold from drainage, depending upon the circumstances. *See Amoco Prod. Co.*, 622 S.W.2d at 568. A common protective measure is for the lessee to exercise its contractual pooling authority and combine tracts from two or more leases into a single unit around an existing well; formation of such a unit is called "pooling." *Tichacek,* 997 S.W.2d at 170; *London v. Merriman*, 756 S.W.2d 736, 739 n.1 (Tex. App.—Corpus Christi 1988, writ denied).

A lessee has no power to pool without the lessor's express authorization, which is usually contained in the lease's pooling clause. *Tichacek*, 997 S.W.2d at 170; *Jones v. Killingsworth*, 403 S.W.2d 325, 327 (Tex. 1965). For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease. *Tichacek,* 997 S.W.2d at 170. A lessee's pooling decision will be upheld unless the lessee pools in bad faith. *Id.*; *Circle Dot Ranch, Inc. v. Sidwell Oil & Gas, Inc.*, 891 S.W.2d 342, 346 (Tex. App.—Amarillo 1995, writ denied). The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have

taken place on each tract within the unit. *Tichacek*, 997 S.W.2d at 170; *see Southland Royalty Co. v. Humble Oil & Ref. Co.*, 249 S.W.2d 914, 916 (Tex. 1952). If the lessee pools in good faith, the lessee is relieved of the obligation to reasonably develop each tract separately or to drill off-set wells on other tracts included in the unit to prevent drainage by a well on one or more of such tracts. *See Tichacek*, 997 S.W.2d at 170; *Southland*, 249 S.W.2d at 916. Conversely, if the lessee does not pool in good faith, production will be considered to take place only on the actual tract upon which it occurs, and production from a unit well will not maintain off-site leases. *Tichacek*, 997 S.W.2d at 170. Generally, the question of good faith or bad faith pooling and unitization is a fact issue to be resolved by the trier of fact. *Circle Dot Ranch*, 891 S.W.2d at 347; *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 205 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.).

In the instant case, all of the leases authorized Union Gas to "pool" acreage owned by the various landowners into a unit for the production of gas. If a pool or unit was formed, Union Gas was then obligated to pay royalties on production located anywhere in the unit to the royalty owners whose land was included in the unit on a pro rata basis based on the amount of acreage that the royalty owner placed in the unit.

### IV. PRE-POOLING ROYALTIES

By their first issue, appellants contend that the trial court erred in refusing to render judgment that appellants recover the stipulated sum of $838,399.26 as their unpaid 3/16th royalty payment for the period of time between the time of first production in September 2000 and the filing of the Designation of Pooled Unit on January 15, 2001. Appellants contend that this was error because: (1) the record is "conclusive" and it is "undisputed" that the leases entitled them to the full 3/16th royalty; (2) as a matter of

9

law, appellants' acts in signing incorrect division orders and accepting incorrect royalty payments, and all other conduct associated with those events, did not amount to waiver or ratification or estop them from claiming their lease rights; (3) the jury's answers to question five of the charge, in which the jury found that appellants ratified and waived this royalty payment, or were estopped from claiming it, were immaterial because the theories of ratification, waiver, and estoppel do not alter the lease obligations for the payment of pre-pooling royalties; and (4) the evidence is legally insufficient to support the jury's findings regarding ratification, waiver, and estoppel.

Appellants' leases provide that they receive a 3/16th royalty interest that can be diluted by an effective pooling unit. Appellants' leases allow for pooling and provide:

> Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease and/or with any other land, lease, or leases . . . . Lessee shall exercise said option as to each desired unit [to pool] by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded.

The Designation of Pooled Unit was filed for public recording on January 15, 2001. The Designation of Pooled Unit stated that the unit would be effective "as of the first day of production from the Union Gas Operating Company-Ohrt-Heinold #1 well," which was in September 2000, approximately four months before the Designation of Pooled Unit was filed. The Ohrts argue that no dispute exists as to the breach of the lease in this regard and as to the amount of pre-pooling royalty that Union Gas has refused to pay in accordance with the Ohrt Leases ($838,399.26), which is the difference between the Ohrts' 3/16th royalty and the amount they actually received between the time of first production and the date on which the Designation of Pooled Unit was filed.

10

In support of their argument, appellants rely upon *Tittizer v. Union Gas Corporation*, 171 S.W.3d at 861, and *Union Gas Corp. v. Gisler*, 129 S.W.3d 145, 149 (Tex. App.—Corpus Christi 2003, no pet.). In *Tittizer*, the lease at issue provided that the lessee could exercise its option to pool by executing an instrument designating the unit and filing it for record, similar to the lease at issue herein:

> Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith.

*Tittizer,* 171 S.W.3d at 860–61. The lessor argued that the language in her lease allowed Union Gas to make the effective date of the pooled unit retroactive by language in the Designation. *Id.* at 861. The supreme court soundly rejected this theory:

> On the contrary, under the terms of the lease, pooling can only be effectuated upon recordation of an instrument identifying the pooled unit. While the lease allows Union Gas to pool by recording at any time, it does not allow Union Gas to pool on a date other than that of recordation of the Designation. Therefore, the attempt by Union Gas to effect pooling on a date prior to the date of recordation—by assigning a different effective date in the Designation—is contrary to the unambiguous terms of the lease. Our courts of appeals have also reached the same conclusion on similar lease language. We hold that this lease does not authorize the lessee to execute a pooling designation with a retroactive effect. The lease provides that unitization can be effective only upon recordation. We affirm the court of appeals' conclusion that the effective date of the pooled unit was the date of recordation of the Designation, and that Tittizer is only entitled to her pro rata share of the royalties earned after that date.

*Id.* (citations omitted). In *Gisler*, the plaintiffs claimed entitlement to all royalties from the date of first production to the time of recordation of the unit based upon the lease's language which indicated that the pooled unit shall be effective upon the recordation of the unit. This Court upheld the trial court's award of all royalties up to the time of

11

recordation, holding that Union Gas could not modify extant contract rights by a subsequent, unilateral, unit designation. *See Gisler,* 129 S.W.3d at 151.

We agree with appellants that pooling is effectuated upon recordation of an instrument identifying the pooled unit and the lessee cannot effect pooling on a date prior to the recordation. *Tittizer*, 171 S.W.3d at 861; *Gisler*, 129 S.W.3d at 151. However, the *Gisler* and *Tittizer* cases are distinguishable from this case insofar as the jury in this case found that ratification, waiver, and estoppel prevented the lessors from claiming their rights under the lease regarding the inception date for the pool.

Accordingly, we next address appellants' arguments in relation to their first issue asserting that their right to the pre-pooling royalties could not be waived as a matter of law. Stated otherwise, appellants contend that the affirmative defenses of waiver, estoppel, and ratification do not apply to the facts at issue in this case.

Appellants argue that Union Gas was not excused from paying the 3/16th royalty for gas that had already been produced and sold because the language in the Designation, "effective as of the date of first production," is not statutorily required to be in the division order. *See* TEX. NAT. RES. CODE ANN. § 91.402 (c)(1) (West 2011). However, section 91.402 expressly provides that a Division Order may state "the effective date of the division order or other instrument," without limiting or prohibiting any specific wording. *See id.* §91.402(c)(1)(A). Appellants also argue that appellees' "excuse" defense is eliminated by Texas Natural Resources Code section 91.402(h), which, according to appellants, shifts the entire risk of loss for errant division orders to lessees. Section 91.402(h) provides:

> The execution of a division order between a royalty owner and lessee or between a royalty owner and a party other than lessee shall not change or relieve the lessee's specific, expressed or implied obligations under an oil

12

and gas lease, including any obligation to market production as a reasonable prudent lessee. Any provision of a division order between payee and its lessee which is in contradiction with any provision of an oil and gas lease is invalid to the extent of the contradiction.

*See id.* § 91.402(h). We disagree with appellants' construction of this statute as it applies to the facts of this case. Division orders are binding until terminated. *See id.* § 91.402(g) (providing that division orders are binding for the time and to the extent that they have been acted on and made the basis of settlements and payments, and, from the time that notice is given that settlements will not be made on the basis provided in them, they cease to be binding, and that division orders are terminable by either party on 30 days written notice); *see also Cabot Corp. v. Brown,* 754 S.W.2d 104, 107–08 (Tex. 1986); *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 691 (Tex. 1986); *Exxon Corp v. Middleton,* 613 S.W.2d 240, 250 (Tex. 1986); *Yzaguirre v. KCS Res.,* 47 S.W.3d 532, 539 (Tex. App.—Dallas 2000), *aff'd,* 52 S.W.3d 368 (Tex. 2001). Appellants were bound by the division orders because they accepted royalty payments based on the unit percentages under the division orders, and they did not revoke the division orders. *See* TEX. NAT. RES. CODE ANN. § 91.402(g); *Cabot Corp.*, 754 S.W.2d at 107–08. Section 91.402(h) of the Texas Natural Resources Code does not render obsolete the "excuse" defense or the long-standing rule that division orders are binding until revoked. *Cabot Corp.,* 754 S.W.2d at 107–08; *see Sun Oil Co.*, 626 S.W.2d at 734 (estoppel based on division orders is valid and binding until division order is revoked); *Neel v. Killam Oil Co.*, 88 S.W.3d 334, 341–42 (Tex. App.—San Antonio 2002, pet. denied) (holding that if claimants had signed new division orders they would have waived their rights to a larger royalty payment), *disapproved on other grounds*, *Hausser v. Cuellar*, 345 S.W.3d 462, 470 (Tex. App.—San Antonio 2011, pet. denied); *Sun Operating P'ship v. Oatman*, 911

13

S.W.2d 749, 756 (Tex. App.—San Antonio 1995, writ denied) (holding that lease was ratified when lessors executed division orders showing lower royalties and accepted royalty payments thereon); *see also Bailey v. Shell W. E&P, Inc.*, 555 F. Supp.2d 767, 773 (S.D. Tex. 2008); *Mattalino v. Trinity Petroleum Exploration*, 927 F. Supp. 986, 989 (S.D. Tex. 1996).

In further connection with this issue, appellants argue that the trial court erred by essentially withdrawing its pretrial partial summary judgment in favor of appellants that "any portions of the Unit designation and/or Division Order which are contrary to the provisions of the lease are invalid." Appellants argue that the court effectively withdrew this ruling at the conclusion of trial by refusing to disregard the waiver, estoppel, and ratification findings "even though they were based on the invalid Division Orders' reference to an effective date that contradicted the effective date set forth in the Ohrt Leases."

A partial summary judgment is interlocutory and thus the trial court retains the right to reconsider it until it enters a final judgment. *Fabio v. Ertel*, 226 S.W.3d 557, 560–61 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Clark v. Strayhorn*, 184 S.W.3d 906, 909 (Tex. App.—Austin 2006, pet. denied); *Loy v. Harter*, 128 S.W.3d 397, 409 (Tex. App.—Texarkana 2004, pet. denied); *see also Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 84 (Tex. 1993) (per curiam) ("The trial court also retains continuing control over interlocutory orders and has the power to set those orders aside any time before a final judgment is entered."). However, a trial court should not conduct a trial on the basis of issues decided as a matter of law before trial and then change its ruling on those issues without affording the parties the opportunity to litigate them. *Bi-Ed, Ltd. v. Ramsey*, 935 S.W.2d 122, 123 (Tex. 1996) (per curiam); *Elder Constr., Inc. v. City of*

14

*Colleyville*, 839 S.W.2d 91, 92 (Tex. 1992) (per curiam); *Fabio*, 226 S.W.3d at 560. In the instant case, the parties were given a full and fair opportunity to litigate all issues pertaining to the division orders and related issues. Accordingly, we conclude that the trial court did not err in this respect.

In a separate sub-issue, appellants contend that "there is no evidence that Union Gas Corporation or any other Defendant was a party to a division order" executed by appellants, and "there is no evidence that Union Gas Corporation or any other Defendant sent royalty checks" to any of appellants. Relying on *Williamson v. Mobil Producing Texas & New Mexico, Inc.,* appellants argue that signing division orders tendered to them and accepting royalty payments from UGOC (not Union Gas) is ineffective to excuse any breach of the lease by Union Gas. 737 S.W.2d 917, 920 (Tex. Civ. App.—Beaumont 1987, writ denied).

The evidence at trial established that Union Gas delegated the responsibilities for drilling, operating the well, and paying royalty payments on its production to UGOC, Union Gas's agent and subsidiary. The evidence also established that appellants were aware of UGOC's role and relationship to Union Gas because they received from and returned to UGOC the division orders and testified that they were aware that Union Gas would rely on the executed division orders. The evidence proved an agency relationship between Union Gas and UGOC and that appellants' conduct with and representations to UGOC were also effective as to Union Gas. *See Fail v. Lee,* 535 S.W.2d 203, 207 (Tex. App.—Fort Worth 1976, no writ) (principal is bound to third persons by the act of his agent whenever the agent's acts are within the scope of his authority).

15

We next address appellants' contentions that the jury's findings that Union Gas was excused from paying pre-pooling royalties were based on legally and factually insufficient evidence. The jury was instructed that: (1) "ratification" means that a "party recognizes the validity of another's conduct by acting or performing under the contract or by otherwise affirmatively acknowledging it," and that if a "party by its conduct recognizes another's performance under a contract as valid, having knowledge of all relevant facts, it ratifies the conduct," and that ratification may be "inferred by a party's course of conduct and need not be shown by express word or deed;" (2) "waiver" means that a party "intentionally relinquishes a known contract right or intentionally engages in conduct that is inconsistent with claiming a known right," and that waiver may be established "by inference in additional express word or conduct;" and (3) "estoppel" means that a party is "bound by the terms of the party's own contract, unless it is set aside by fraud, accident or mistake," and that the effect of estoppel is to "prevent a party to a contract from taking a position inconsistent with the contract, to the prejudice of the other," and that estoppel may be based on "silence or inaction if one who is under a duty to speak or act has by his silence or inaction misled the opposing party to his detriment."

As stated recently by the Texas Supreme Court in the context of arbitration agreements, waiver is the intentional relinquishment of a right actually or constructively known or intentional conduct inconsistent with claiming that right. *Perry Homes v. Cull*, 258 S.W.3d 580, 602–03 (Tex. 2008). The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right. *Id.*

16

A non-breaching party will be deemed to have affirmed the contract or waived its right to terminate the contract for such breach when it evidences a conscious intent to do so or it acts to induce the other party's detrimental reliance. *See Consol. Eng'g Vo., Inc. v. S. Steel Co.*, 699 S.W.2d 188, 191 (Tex. 1985). Prolonged silence or inaction in not asserting a known right is conduct that may amount to waiver. *Horton v. DaimlerChrysler Fin. Servs.*, 262 S.W.3d 1, 6 (Tex. App.—Texarkana 2008, no pet.); *Martin v. Birenbaum*, 193 S.W.3d 677, 681 (Tex. App.—Dallas 2006, pet. denied).

Ratification occurs if a party recognizes the validity of a contract by acting or performing under the contract or by otherwise affirmatively acknowledging it, or, in other words, "if a party by its conduct recognizes a contract as valid, having knowledge of all relevant facts, it ratifies the contract." *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 146 (Tex. App.—Corpus Christi 2006, pet. denied); *Barker v. Roelke*, 105 S.W.3d 75, 84 (Tex. App.—Eastland 2003, pet. denied); *see Mo. Pac. R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex. App.—Austin 2002, pet. dism'd); *see also Old Rep. Ins. Co. v. Fuller*, 919 S.W.2d 726, 728 (Tex. App.—Texarkana 1996, pet. denied). Ratification occurs when a party recognizes the validity of the contract by acting under the contract, performing under the contract, or affirmatively acknowledging the contract. *See Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 165–66 (Tex. App.—Tyler 2011, no pet.).

Estoppel by contract is a form of quasi-estoppel based on the proposition that a party to a contract will not be permitted to take a position inconsistent with its provisions to the prejudice of another. *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *Hawn v. Hawn,* 574 S.W.2d 883, 886 (Tex. Civ. App.—Eastland 1978, writ ref'd n.r.e.); *United Fid. Life Ins. Co. v. Fowler,* 38 S.W.2d 128, 131 (Tex. Civ.

App.—Dallas 1931, writ dism'd w.o.j.). The rule is not one of estoppel, as estoppel *in pais,* but is just another way of saying that a party is bound by the terms of a contract unless it is void or is annulled or set aside in some way. *See Stevens v. State Farm Fire & Cas. Co.,* 929 S.W.2d 665, 672 (Tex. App.—Texarkana 1996, writ denied).

The evidence at trial showed that appellants agreed to modify their leases, resulting in the pooling of their land into two units, and they agreed to receive royalty payments from those two units. Appellants had assistance of counsel throughout the modification process who reviewed the leases, monitored the formation of the units, and directed inquiries about the formation of the units to Union Gas.

On January 15, 2001, Union Gas filed a Designation of Pooled Unit creating the Ohrt-Heinold Gas Unit as a public record in Victoria County. The Unit Designation included the size of the Unit, the specific lands that comprised the Unit, and the declared effective date of the Unit. It was filed as of public record, but neither appellants nor their counsel objected to the Unit Designation by notifying Union Gas regarding the alleged discrepancy.

Shortly thereafter, UGOC sent division orders to appellants which they executed and returned. The division orders, which were admitted into evidence, identified the Ohrt-Heinold Gas Unit "as described in the designation of gas unit" filed by Union Gas, delineated its size, and stated that their effective date was the "the date of first production." The division orders state that the signatures of appellants "[certify] the ownership of their decimal interest in production or proceeds as described" therein. They require lessors to notify in writing of any change in ownership, interest, or address. Appellants did not object to the division orders, inform appellees that their decimal interest as stated therein was incorrect, or otherwise act to revoke the division orders.

18

David Ohrt testified that he and his family did not realize the effective date language in the division orders and assumed the division orders were correct. *See In re Bank of Am., N.A.*, 278 S.W.3d 342, 344 (Tex. 2009) (orig. proceeding) (applying the presumption that a party that signs a contract knows its contents).

Appellants accepted and cashed royalty checks beginning in March 2001, paying them, not a 3/16th royalty share for the period of September 2000 through January 2001, but instead paying them the lower Unit royalty interest. The checks included statements providing what the production was during the relevant period of time and describing how the royalty interests were calculated.

Union Gas limited partner, Randall Lowry, testified that filing the designation and sending it to the Ohrts with an accompanying letter should have prompted them to object to the Unit formation or decimal interest, if they had a complaint, but appellants never objected. David Ohrt testified that appellants accepted royalty checks in March 2001 and thereafter and that the royalty checks were accompanied by a statement of production amounts and calculation of royalties.

In viewing the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not, we conclude that the jury's findings that appellants' conduct excused appellees' payment of a full 3/16th royalty are supported by legally and factually sufficient evidence. *City of Keller*, 168 S.W.3d at 807. Considering and weighing all of the evidence in the record, we do not conclude that the jury's verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. The jury had before it sufficient evidence from which it may have reasonably concluded that appellants knew their leasehold

19

interests, the contents of the designation, and the contents of the divisions orders, yet did not object to or otherwise revoke the division orders and payments thereunder.

We overrule appellants' first issue and sub-issues therein.

## V. DEPTH LIMITATION

By their second issue, appellants argue that because the Designation of Pooled Unit failed to comply with the depth limitations in the Ohrt Leases, Union Gas's attempt to pool the lease with others is invalid, as a result of which appellants are entitled to 3/16th of production from the Ohrt-Heinold No. 1 Well. Appellants contend that the leases grant Union Gas the authority to pool with other leases from the surface of the ground down to 9,000 feet below, not to exceed 320 acres, plus 10% tolerance. This breach of contract issue arose because the leases contain the following depth limitation language:

Burnette Ohrt Lease

In the event Lessee exercises his option to pool in accordance with the terms and provisions of Paragraph four (4) herein, the right to pool for gas including condensate or distillate, is hereby limited to three hundred twenty (320) acres plus ten percent (10%) tolerance as to all horizons from the surface of the ground down to a depth of nine thousand feet (9,000') below the surface of the ground, it being understood that Lessee shall have the right to pool or unitize the land covered hereby for gas including condensate and distillate as to all depths below nine thousand feet (9,000') below the surface of the ground in accordance with the terms and provisions set forth in said Paragraph four (4) above.

David Ohrt Lease

In the event Lessee exercises his option to pool in accordance with the terms and provisions of Paragraph four (4) herein, the right to pool for gas, including condensate and distillate, is hereby limited to three hundred twenty (320) acres, plus ten percent (10%) tolerance, as to all horizons from the surface of the ground, it being understood that Lessee shall have the right to pool or unitize the lands covered hereby for gas including condensate and distillate as to all depths below provisions set forth in said Paragraph four (4) above.

20

On July 17, 2000, an amendment to the Ohrt leases was executed, which stated:

Burnette Ohrt Lease

If Lessee exercises the option to pool acreage for gas production as provided for in Paragraph seventeen (17) and if the unit well is located on Lessor's property, *all of Lessor's remaining acreage will be included in the unit*; if the unit well is not located on the leased premises and any of lessor's acreage is included in the unit, at least sixty (60) acres of Lessor's lease will be included in the producing unit. Where Lessor's acreage available for pooling consists of an amount less than the entire lease, then the balance of such available, contiguous acreage of the Lessor as controlled by the Lessee will be placed in said unit.

David Ohrt Lease

If Lessee exercises the option to pool acreage for gas production as provided for in Paragraph seventeen (17) and if the unit well is located on Lessor's property, *all of Lessor's remaining acreage will be included in the unit*; if the unit well is not located on the leased premises, and any of Lessor's acreage is included in the unit, at least twenty-two (22) acres of Lessor's lease will be included in the producing unit. Where Lessor's acreage available for pooling consists of an amount less than the entire lease, then the balance of such available, contiguous acreage of the Lessor as controlled by the Lessee will be placed in said unit.

(Emphasis added).

Appellants contend that appellees' breach of contract "is undisputed" and the jury's conclusions regarding excuse are "insupportable" for the same reasons as previously discussed with regard to their first issue. Appellants further contend that the division orders "revealed absolutely no information whatsoever about the geological, engineering or seismic features that went into the Designation of Pooled Unit;" there was no evidence that appellants had any actual knowledge of what was written in the Designation of Pooled Unit;" and "Union Gas failed to produce evidence that [appellants] had full knowledge of material facts regarding Union Gas'[s] breach of the depth limitation when they signed the Division Orders and accepted the incorrect royalty payments based thereon."

21

As stated previously, the jury found that appellants excused "any failure to comply with the lease term that only 320 acres + 10% tolerance could be pooled as to depths 9,000 feet and shallower for the production of gas." Specifically, the jury found that appellants ratified the pooling of more than 320 acres + 10% tolerance for depths shallower than 9,000 feet for the production of gas and that appellants waived their complaints and were estopped to complain.

We have earlier discussed these rules and how the defenses are to be applied regarding the sufficiency of the evidence. *See* TEX. R. APP. P. 47.1, 47.4. With respect to this issue, appellants executed lease amendments that required Union Gas to put all of appellants' rights in the property, without regard to depth, in the unit if the well was located on their property, as it was. Testimony to that effect and the meaning of this provision was elicited at trial. Appellants' lease amendments support the jury's findings regarding ratification, waiver, and estoppel. We conclude that the jury's findings are supported by legally and factually sufficient evidence. *City of Keller*, 168 S.W.3d at 807; *Cain*, 709 S.W.2d at 176.

We overrule appellants' second issue.

## VI. ATTORNEY'S FEES

In their third issue, appellants contend that this case should be remanded for a new trial on their claim for attorney's fees and, alternatively, a new trial on their claims for breach of the Ohrt lease. In connection with this issue, appellants argue that the attorney's fee claim should be remanded because the jury's answers of "zero" to the question regarding the award of attorney's fees and the jury's refusal to award any amount of reasonable attorney's fees, is so against the great weight of the evidence as to be manifestly wrong and unjust. Appellants further argue that if issues one and two

22

are not sustained, that their breach of lease claims should be remanded because the evidence is factually insufficient to support the jury's "excuse" findings in response to questions five and six of the charge. In connection with this issue, appellants point out that the jury awarded "0" damages to four of five sub-parts to the question regarding fees, but left one sub-part blank.

To the extent that appellants' argument underlying this issue pertains to the sufficiency of the evidence regarding their claims for breach of the lease, we have already addressed this argument in connection with appellants' other issues, and accordingly, need not address it further. *See* TEX. R. APP. P. 47.1, 47.4.

Appellants' claim for legal fees was premised on section 38.001 of the Texas Civil Practice and Remedies Code and chapter 91 of the Texas Natural Resources Code. Appellants' counsel provided trial testimony regarding the amount of reasonable attorney's fees incurred in this case. According to appellants, the agreed-upon fee is a contingent 45% of recovery on the litigated claims which escalates to 50% in the event of an appeal, but if charged at hourly rates, reasonable attorney's fees would amount to $271,900.17 for trial-related work plus an additional $40,000 for appeals to this Court and the Texas Supreme Court.

The jury was asked, "[w]hat sum of money do you find to be reasonable and necessary attorneys' fees for the services rendered in this case on behalf of the Ohrt Plaintiffs in the following categories?" The charge instructed the jury regarding the factors to consider in determining the reasonableness of a fee. The jury completed the question as follows:

> 4A.    For legal services rendered in the trial and preparation of this cause in this Court:

23

Answer in dollars and cents, if any:   $ _____

Answer by stating a percentage:   _____**0**_____

The jury also answered "0" to additional questions about fees for motions for new trial and appeals to this Court and the Texas Supreme Court.

The Ohrts seek to recover attorney's fees under section 38 of the Texas Civil Practice and Remedies Code and Chapter 91 of the Texas Natural Resources Code. Chapter 38 of the Texas Civil Practice and Remedies Code pertains to the recovery of attorney's fees in breach-of-contract cases. *Ashford Partners, Ltd. v. ECO Res., Inc.*, No. 10-0615, 2012 Tex. LEXIS 340, at \*14 (Tex. 2012). Section 38.001 provides that: "A person may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). However, in order to qualify for fees under the statute, a litigant must prevail on a breach of contract claim and recover damages. *Ashford Partners, Ltd.*, 2012 Tex. LEXIS 340, at \*\*14–15; *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009). As appellants have not done this, they are not entitled to attorney's fees under this statute.

Section 91.406 of the Texas Natural Resources Code provides that, in a suit to collect proceeds and interest from the sale of oil and gas, the court shall include in any final judgment *in favor of the plaintiff* an award of reasonable attorney's fees. TEX. NAT. RES. CODE ANN. § 91.406 (West 2001) (emphasis added); *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 570–71 (Tex. App.—San Antonio 2011, no pet.); *Headington Oil Co., L.P. v. White*, 287 S.W.3d 204, 215–16 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Applying the plain meaning of the word 'favorable,' we consider any judgment 'favorable' to the plaintiff when he obtains a measure of relief which

24

leaves him in a better position than he held before filing suit." *Headington Oil Co., L.P.*, 287 S.W.3d at 216. In this case, judgment was not rendered in favor of appellants. Accordingly, appellants were not entitled to recover attorney's fees under this statute. Because appellants did not prevail on any cause of action for which attorney's fees are recoverable and did not recover damages, they are not entitled to recover attorney's fees.

To the extent that appellants' arguments regarding attorney's fees are predicated on the jury's failure to answer the "dollar and cents" question and answer the "percentage" question as "0," we note that a party seeking attorney's fees must ask for a specific dollar amount, not a percentage of the judgment. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997); *VingCard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 869 (Tex. App.—Fort Worth 2001, pet. denied) (op. on reh'g). Further, when a jury's response to a question is incomplete, the remedy is to ask the jury to retire and complete the charge. *See Lewis v. Tex. Emp. Ins. Ass'n*, 246 S.W.2d 599, 601 (Tex. 1952). For a party to complain on appeal, it must have first given the trial court the opportunity to correct the error. *Id.* Here, the jury was discharged before appellants complained of this alleged defect; thus appellants waived the issue of the jury's failure to answer an issue about the amount of attorney's fees. *Id.* We overrule appellants' third issue.

## VI. BAD FAITH POOLING

By their fourth issue, appellants contend that the take nothing judgment on their claim for bad faith pooling should be reversed and the corresponding part of the cause remanded for a new trial. Appellants argue that: (1) the trial court erred in permitting appellees to join the McAdams and Chilcoat groups as third-party defendants and in

refusing to either sever the actions between them or try them separately; (2) after the McAdams and Chilcoat third-party defendants settled with appellees, leaving no issue concerning them for the jury to determine, the trial court erred in allowing the McAdams and Chilcoat third-parties to participate in the trial as adversaries of appellants; and (3) the trial court erred in refusing to instruct the jury that the "reasonably prudent operator standard" is not "reduced" as to appellants because of the fact that appellees have other lessors in the same pooled unit and that other lessors should not be considered in deciding whether appellees failed to comply with their duty of good faith to appellants.

We first address appellants' contention that the trial court erred in permitting appellees to join the McAdams and Chilcoat groups as third-party defendants and in refusing to sever or try separately their litigation with Union Gas. As background, Union Gas sought leave to join all lessors under the Ohrt-Heinold Gas Unit, including the McAdams group and the Chilcoat group, as third-party defendants in this case on grounds that relief granted to appellants would have a significant adverse impact on the other lessors.

We review a trial court's decision regarding the joinder of parties for abuse of discretion. See *Kodiak Res., Inc. v. Smith*, 361 S.W.3d 246, 248–49 (Tex. App.—Beaumont 2012, no pet.); *Longoria v. Exxon Mobil Corp.*, 255 S.W.3d 174, 180 (Tex. App.—San Antonio 2008, pet. denied). A trial court abuses its discretion if it acts in an unreasonable and arbitrary manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Texas Rule of Civil Procedure 39 governs questions regarding joinder. *See* TEX. R. CIV. P. 39; *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 162 (Tex. 2004). Rule 39(a) concerns the joinder of "persons needed for just adjudication" and provides:

26

A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.

TEX. R. CIV. P. 39(a); *see Brooks*, 141 S.W.3d at 162. Although Rule 39 provides for joinder in mandatory terms, "there is no arbitrary standard or precise formula for determining whether a particular person falls within its provision." *Cooper v. Tex. Gulf Indus., Inc.*, 513 S.W.2d 200, 204 (Tex. 1974); *see Kodiak Res., Inc.*, 361 S.W.3d at 248–49; *Longoria*, 255 S.W.3d at 180. In this regard, we note that the trial court has "broad" discretion in deciding matters regarding joinder. *Royalty Petroleum Corp. v. Dennis*, 332 S.W.2d 313, 317 (Tex. 1960); *Longoria*, 255 S.W.3d at 180. Similarly, the standard of review on severance is abuse of discretion. *In re Allstate Tex. Lloyds*, 202 S.W.3d 895, 899 (Tex. App.—Corpus Christi 2006, no pet.).

Appellees assert that joinder of the McAdams and Chilcoats was required because they were all members of the unit sharing in all production from the unit. Because the Ohrt-Heinold No. 1 Well was the only well in the unit, if appellants had prevailed on their claims seeking cancellation of the unit, appellants would have received all royalties from that well, and other unit lessors, including the McAdams and Chilcoats, would be entitled to no royalties on the Unit's production from the well. Appellees further assert that the evidence showed that the Ohrt-Heinold Well was draining gas from under the McAdams' and Chilcoats' lands, entitling them to a share of the production from the well.

27

We conclude that the trial court did not abuse its discretion in allowing joinder of the third-party defendants. *See Royalty Petroleum Corp.*, 332 S.W.2d at 316–17 (holding trial court has discretion to require joinder of royalty interest owners whose interests will be directly and possibly adversely affected by decree in trespass to try title action); *Veal v. Thomason*, 159 S.W.2d 472, 477 (Tex. 1942) (holding, under prior rule regarding joinder, that royalty owners under the other lease contracts in a unitized block are necessary parties to suit under prior version of rule 39); *Kodiak Res., Inc.*, 361 S.W.3d at 248–49 (holding that it was error for the trial court not to join non-party lessors who had a financial interest in the leases and pooling agreement); *Longoria*, 255 S.W.3d at 183 (holding trial court did not abuse its discretion in finding that the energy company defendants' lessors, the owners of royalty interests in the property at issue, and the owners of the mineral estate in un-leased part of the 9200 acres should be joined as parties if feasible); *Tex. Oil & Gas Corp. v. Ostrom*, 638 S.W.2d 231, 234–35 (Tex. App.—Tyler 1982, writ ref'd n.r.e.) (holding trial court did not abuse its discretion in failing to require joinder of owners of non-possessory royalty interests and possibilities of reverter in partition suit between owners of mineral leasehold estate, although "it would be wise" to join them); *Pan Am. Petroleum Corp. v. Vines*, 459 S.W.2d 911, 914 (Tex. Civ. App.—Tyler 1970, writ ref'd n.r.e.) ("Measured by the rules set out above, all of the royalty owners in Parker Gas Unit "B" are necessary and indispensable parties."); *cf. Sabre Oil & Gas Corp. v. Gibson*, 72 S.W.3d 812, 816 (Tex. App.—Eastland 2002, pet. denied) (holding that the trial court did not err in denying a plea in abatement to obtain joinder of other royalty owners in a pooled unit on grounds that the "presence of the other royalty owners was not necessary to determine whether Sabre pooled in bad faith and breached the terms of the lease."); *MCZ, Inc. v. Smith*, 707 S.W.2d 672, 675

(Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (holding that the trial court did not err in denying a plea in abatement on grounds that individuals owning the balance of the working interest were not necessary parties).

Had appellants prevailed on their claim to cancel the unit, have it declared void or recover all of the royalties paid prior the filing of the unit designation, the McAdamses' and Chilcoats' ability to protect their interest would have been impaired or impeded and would have exposed appellees to a substantial risk of incurring multiple or inconsistent obligations. *See* TEX. R. CIV. P. 39(a)(2). Accordingly, based on the foregoing, we conclude that the trial court did not abuse its "broad" discretion in allowing joinder. *Downer*, 701 S.W.2d at 241–42; *Royalty Petroleum Corp.*, 332 S.W.2d at 317.

In connection with their fourth issue, appellants assert that the trial court erred in allowing the McAdams and Chilcoat third-party defendants to participate in trial given that they had settled with Union Gas. The sole case that they cite in favor of this position is *City of Houston v. Sam P. Wallace & Co.*, 585 S.W.2d 669 (Tex. 1979). In *Wallace*, the City of Houston sued Wallace Company and Precision Insulation Company, Inc. for property damages to a water cooling plant which resulted from an explosion and fire. *Id.* at 670. Wallace Company had a contract with the City of Houston to construct certain additions to its water cooling plant and Precision Insulation had a subcontract with Wallace Company to perform certain insulation work. *Id.* Maurice Little, an employee of Precision Insulation, brought a separate suit against Wallace Company for personal injuries sustained in the same incident. *Id.* The trial court consolidated the two lawsuits. *Id.* Wallace Company's answer asked for indemnity against Precision Insulation, and Precision Insulation prayed for judgment

29

against City of Houston. *Id.* The trial court aligned the City of Houston and Little as co-plaintiffs and Wallace Company and Precision Insulation as defendants. *Id.*

During the trial, but after the close of evidence, Little secretly made a settlement with Wallace Company just before final arguments and then changed his posture by arguing that the City of Houston, rather than defendant Wallace Company, was at fault in causing both the property damages and personal injuries. *Id.* at 671. While the jury was deliberating and counsel for City of Houston was absent from the courtroom, Little asked for a nonsuit. *Id.* City of Houston did not discover the secret settlement or learn of the nonsuit until one week later. *Id.* The jury answered special issues adversely to both City of Houston and Little and the trial court rendered judgment that City of Houston take nothing. *Id.*

In analyzing this issue, the Texas Supreme Court concluded that Little's counsel had "no business making an argument to the jury at all." *Id.* at 672. In reviewing the effect of the jury argument, the court discussed *Degen v. Bayman*, 86 S.D. 598, 200 N.W.2d 134 (1972), wherein the plaintiff settled with one co-defendant who then changed positions and argued for the plaintiff and against his co-defendant, and quoted with approval language from that case saying: "Not knowing the motive for the evaporation of adversary vigor between plaintiff and Bayman, this benevolent candor coming from a joint tortfeasor could only appear to the jury as a shattering admission." *Id.*

The court noted that after Little's settlement with Wallace Company, he had no further claim against any party and no other party had any claim against him, and that the jury findings on Little's issues would not affect the claims for indemnity. *Id.* According to the court, candor required a disclosure to the court that Little had no

30

further interest in the case in order to prevent submitting meaningless special issues that inquired about Wallace Company's negligence toward Little, Little's contributory negligence, and his damages. *Id.* The court concluded that the trial court erred in refusing to grant City of Houston's motions for mistrial and new trial by reason of the misalignment of the parties at the argument stage of the trial in which the jury received a distorted and unfair portrayal of the posture of the parties. *Id.* at 673.

We conclude that *City of Houston* is distinguishable from the instant case and does not compel the same result. First, the settlements at issue between the McAdamses, the Chilcoats, and Union Gas were not secret. Second, the McAdams and Chilcoat parties continued to have interests in the outcome of the bad faith pooling claims asserted by appellants because the resolution of those claims could cancel the Unit in which they continued to be participating royalty owners. Third, and finally, there are many cases illustrating that the trial court has discretion to allow settling parties to participate in trial in such circumstances. *See, e.g.*, *Webster v. Lipsey*, 787 S.W.2d 631, 638 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (allowing a Mary Carter defendant to participate at trial was not error when the jury was informed of the settlement agreement); *Am. Cyanamid v. Frankson*, 732 S.W.2d 648, 654–55 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.) (allowing settling defendants to participate at trial when the jury was aware that a settlement with those defendants had been reached); *Turner v. Monsanto Co.*, 717 S.W.2d 378, 381 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (allowing settling defendant to participate in trial where it retained an interest in the litigation and was entitled to protect that interest by participating as a party defendant in the trial); *McAllen Kentucky Fried Chicken No. 1, Inc. v. Leal*, 627 S.W.2d 480, 484 (Tex. App.—Corpus Christi 1981, writ ref'd n.r.e.)

31

(allowing counsel for nonsuited parties to participate in the trial on the merits where the "true interest[s] of all parties involved in the trial of this case were clearly made known to the jury"). We conclude that, under the circumstances present in this case, the trial court did not err in allowing the McAdams and Chilcoat parties to participate at trial.

In a further sub-issue, appellants contend that, under Texas law, the issue of whether a lessee failed to comply with its duty to exercise good faith in pooling a particular lease is supposed to be determined without regard to how other leases in the pooled unit might be affected by the determination. As stated by appellants, this issue "centers on the McAdams and Chilcoat parties' presence and participation in this suit." In a separate sub-issue, appellants contend that the trial court erred in refusing to instruct the jury that the "reasonably prudent operator standard" is not to be reduced as to appellants because there are other lessors in the same pooled unit and that other lessors should not be considered in deciding whether appellees failed to comply with their duty of good faith to appellants. We have already determined the trial court did not abuse its discretion in allowing the joinder of the McAdams and Chilcoats in the suit and their participation in trial. Accordingly, we review these sub-issues only to the extent that they raise a separate issue on appeal.

Appellants' focus here is on the jury questions regarding whether appellees "breached their duty to pool" the Burnette Ohrt Lease and the David Ohrt Lease into the Ohrt-Heinold Gas Unit in good faith. The trial court's instructions to the jury included the following:

> You are instructed that when a lessee elects to pool a lease with other leases to form a pooled unit such as the Ohrt–Heinold Gas Unit the lessee must do so in Good Faith. In order to form a pooled unit in Good Faith, a Lessee must exercise the power to pool a lease with another lease or leases on other or separate tracts to form a pooled unit as a Reasonably

32

Prudent Operator in fairness having due regard for the interests of both the Lessors and the Lessee.

You are instructed that the term "Reasonably Prudent Operator" as used in this charge, means an operator of ordinary prudence, having neither the highest nor the lowest prudence, but on the contrary an operator of average prudence and intelligence, acting with ordinary diligence under the same or similar circumstances.

Appellants proffered an additional instruction and contend that the trial court erred in refusing to instruct the jury that "the Defendants' duty is not to be reduced because the Defendants have other lessors in the same pooled unit; that the jury is not to consider the fact that the Defendant may have other leases from other persons in the same pooled unit in deciding whether the Defendants have acted with fairness and due regard to these particular plaintiffs."

The rules of civil procedure require that the trial court submit any explanatory instructions necessary to enable the jury to reach a verdict. *See* TEX. R. CIV. P. 277; *Wichita Cty. v. Hart*, 917 S.W.2d 779, 783–84 (Tex. 1996). For an instruction to be proper, it must (1) assist the jury in its deliberations, (2) accurately state the law, and (3) be supported by the pleadings and the evidence. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009). The trial court has considerable discretion in determining what instructions are necessary. *Id.* at 856. If, in light of the entire charge, a particular instruction would exaggerate, minimize, or withdraw from the jury's consideration some pertinent evidence, that instruction would be improper. *Valence Operating Co. v. Anadarko Petroleum Corp.*, 303 S.W.3d 435, 442–43 (Tex. App.—Texarkana 2010, no pet.); *Moody v. EMC Servs., Inc.*, 828 S.W.2d 237, 244 (Tex. App.—Houston [14th Dist.] 1992, writ denied); *Lively Exploration Co. v. Valero Transmission Co.*, 751 S.W.2d 649, 653 (Tex. App.—San Antonio 1988, writ denied).

33

"When a trial court refuses to submit a requested instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (citation omitted); *see also* TEX. R. CIV. P. 277, 278. Error in the omission of an instruction is reversible only if the omission "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a); *Shupe*, 192 S.W.3d at 579; *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006).

Appellants rely on *Amoco Production Company v. Alexander,* 622 S.W.2d 563, and *United States Steel Corporation v. Whitley,* 636 S.W.2d 465 (Tex. App —Corpus Christi 1982, writ ref'd n.r.e.), for their position that other multiple lessors' interests are not factors to be considered in determining whether it complied with its duty of good faith to the Ohrts. *Amoco* concerned a breach of duty by Amoco for drainage and failure to protect by producing from others' land in a way that reduced the plaintiffs' share of the field's production.

> Amoco argues the Court of Civil Appeals did not consider that Amoco has obligations to all of its lessors in the field. Anything it does to maintain or increase production from updip leases may accelerate the water drive and expose Amoco to liability to downdip lessors. If Amoco fails to maintain or increase updip production, it is exposed to liability from the updip lessors. Amoco argues the Court has placed it between contrary obligations from which there is no escape. The fulfilling of one obligation necessarily causes the breach of the other.

> The conflicts of interest of Amoco, as a common lessee, cause us concern. The Alexander leases provided for 1/6th royalty while Amoco's updip leases provided for 1/8th royalty. There is no economic incentive for Amoco to increase production on the Alexander lease because it will eventually recover the Alexander's oil updip. Money invested in the Hastings, West Field, will have a longer productive life if invested updip. The greater the updip production the sooner Amoco's competitor Exxon will water out. Money spent updip will yield greater returns than money spent downdip because of higher daily production. With downdip operators out of production Amoco can produce its upper sands without

34

competition and can begin production from its lower sands where it does not have significant production competition.

These conflicts would not occur if Amoco was not a common lessee (lessee common to downdip and updip lessors). If the Alexanders were the only Amoco lessor, their interests would more nearly coincide. Amoco's interest would be to capture the most oil possible from the Alexander leases before they watered out.

Amoco's responsibilities to other lessors in the same field do not control in this suit. This lawsuit is between the Alexanders and Amoco on the lease agreement between them and the implied covenants attaching to that lease agreement. The reasonably prudent operator standard is not to be reduced to the Alexanders because Amoco has other lessors in the same field. Amoco's status as a common lessee does not affect its liability to the Alexanders.

*Amoco Prod. Co.*, 622 S.W.2d at 569.

*Whitley* pertained to the lessee's breach of the duty to act as an ordinary prudent operator in failing to produce uranium from the Whitley's 98-acre tract with due diligence. *Whitley*, 636 S.W.2d at 471. In that case, the lessee argued that the amount of due diligence required by a lessee in the mining of hard minerals is not nearly as great as that required in the mining of oil and gas, reasoning that if the court were to look at the lessee's activity in the entire area (other leases), the evidence revealed that it had been both diligent in producing minerals from the entire ore body in the surrounding area, and diligent in increasing production on the Whitley leasehold by improved solution mining methods. *Id.* In concluding that the evidence supported the jury's verdict that the lessee did not act as a reasonably prudent operator, the court stated that:

It is well settled that a lessee's responsibility to other lessors in the same field does not control. This lawsuit is between the Whitleys and U.S.S. on the lease agreement between them and the implied covenant to develop under this lease agreement. U.S.S.'s status as a common lessee does not affect its liability to the Whitleys.

35

*Id.* (citing *Amoco Prod. Co.*, 622 S.W.2d at 569).

*Amoco* and *Whitley* are not squarely on point with this case, which concerns the duty of the lessee to act as a reasonably prudent operator with regard to its duty to pool in good faith. *Amoco* concerned the lessee's failure to protect a lessor from drainage while favoring other lessors in the field. *See Amoco Prod. Co.*, 622 S.W.2d at 569. *Whitley* concerned a lessee's duty to develop a tract for a non-migratory mineral, uranium. *See Whitley*, 636 S.W.2d at 471. Given the nature of pooling, insofar as the right to pool is derived from the terms of multiple leases, it would misstate the applicable law to instruct the jury to consider only the interests of one set of landowners in determining whether or not there is a breach of the duty to pool in good faith. *See Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 855. Reviewing the charge, we conclude that appellants' additional requested instruction was "not necessary to enable the jury to reach a proper verdict." *Shupe*, 192 S.W.3d at 579; *see also* TEX. R. CIV. P. 277, 278. The trial court's instructions to the jury accurately and fully informed the jury that when determining to form a pooled unit, the lessee must act in good faith as a reasonably prudent operator in fairness, having due regard for the interests of both the lessors and lessee. We conclude that the trial court did not err in refusing to provide the additional instruction to the jury.

Moreover, even if we were to conclude otherwise and agree that the trial court erred in refusing to submit the additional instruction to the jury, appellants have not shown that the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). On appeal, we reverse for error in the jury charge only, if after considering the record as a whole, including the pleadings, the evidence presented at trial, and the charge in its entirety, we conclude the error probably caused rendition of

36

an improper verdict or probably prevented the appellant from presenting the case to the appellate court. *See id.*; *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003); *Air Prods. and Chems., Inc. v. Odfjell Seachem A/S*, 305 S.W.3d 87, 100 (Tex. App.—Houston [1 Dist.] 2009, no pet.). After performing this review in the instant case, we do not find that the alleged error probably caused the rendition of an improper verdict or probably prevented the appellants from presenting the case to this Court. *See* TEX. R. APP. P. 44.1(a)(1).

In their final sub-issue, appellants contend that "[s]ince the bad faith pooling issues submitted [to the jury] were hotly contested with expert testimony from both sides, the jury well could have answered 'yes' to [the jury questions regarding bad faith pooling] if the court had correctly handled the roles of the McAdams and Chilcoat leases." We have already concluded that the trial court did not commit error with regard to the joinder of the McAdams and Chilcoats or their participation in trial. The jury declined to find that the lessees breached their duty to pool the leases in good faith, and appellants do not contend that this finding was supported by legally or factually insufficient evidence. We reject appellants' final sub-issue.

Appellants' fourth issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

_____
GREGORY T. PERKES
Justice

Delivered and filed the
31st day of August, 2012.

37